[Cite as *State v. Baldwin*, 2025-Ohio-398.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 24AP-165 |
| | | (C.P.C. No. 09CR-7037) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Ashley Baldwin, | : | |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on February 6, 2025

---

**On brief:** *Bellinger & Donahue*, and *Kerry M. Donahue*, for appellant.[1]

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Seth Gilbert*, for appellee.
**Argued:** *Seth Gilbert*.

---

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1}  Defendant-appellant, Ashley Baldwin, appeals from the December 15, 2023 decision and entry of the Franklin County Court of Common Pleas denying her motion to withdraw her guilty plea.  For the reasons that follow, we affirm.

I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}  On November 24, 2009, Baldwin was indicted by a Franklin County Grand Jury on one count of aggravated murder, an unclassified felony, in violation R.C. 2903.01 (Count One); two counts of aggravated robbery, felonies of the first degree, in violation of R.C. 2911.01 (Counts Two and Four); two counts of having weapon while under disability, felonies of the third degree, in violation of R.C. 2923.13 (Counts Three and Six); and one

---

[1] Counsel for Baldwin failed to appear for oral arguments.

count of robbery, a felony of the second degree, in violation of R.C. 2911.02 (Count Five). Counts One, Two, Four, and Five all carried three-year firearm specifications in accordance with R.C. 2941.145. Counts One through Three involved the murder of J.D. on November 10, 2009. Counts Four through Six involved the robbery of B.H. on April 16, 2009.

{¶ 3} After previous counsel, Paul Scott, withdrew from the case, the trial court appointed attorney George Luther as counsel for Baldwin on January 11, 2010. In January 2010, Luther filed a series of discovery-related motions. On March 19, 2010, the trial court authorized payment of a forensic psychologist or other medical professional to assist counsel in his "investigation, preparation and presentation of evidence herein including testimony, if necessary." (Mar. 19, 2010 Journal Entry.) An investigator was also hired to assist in the case.

{¶ 4} On the morning of June 9, 2010, Baldwin agreed to plead guilty to aggravated murder and aggravated robbery without firearm specifications. The parties agreed to a joint sentencing recommendation of 30 years to life in prison. After the state set out the charges and the joint recommendation of the parties, the trial court asked defense counsel whether he approved of the plea agreement and if his client understood the consequences of the plea as well as the rights she agreed to waive. According to Luther, "[he] met with her last night and went through the plea form, explaining it to her, the consequences of this plea, and the various rights that she would be giving up today." (June 9, 2010 Morning Session Tr. at 4.) When asked if Baldwin was mentally competent at this time, Luther responded, "Yes. I've had her evaluated." (Tr. at 4.) During the colloquy, Baldwin and the trial court engaged in the following exchange:

THE COURT: Now, my understanding is that you do not want a trial. Is that correct?

THE DEFENDANT: No, I want a trial now.

THE COURT: You want a trial now?

THE DEFENDANT: Yes, sir.

THE COURT: You know you executed these forms stating that you did not want a trial and that you wanted to enter a plea of guilty.

THE DEFENDANT: Yes, sir.

THE COURT: And you wish at this time to not have this plea of guilty taken, and you wish to have the Court go ahead and impanel a jury and have a trial.

THE DEFENDANT: Yes, sir.

(Tr. at 8.)

{¶ 5} Upon discussions with counsel off the record, the trial court proposed setting the matter for a motion hearing and trial on June 15, 2010. (Tr. at 8-9.) Luther renewed a previous motion to continue the trial to July. Luther posited that a continuance was appropriate as he had just finished another murder trial the day prior and the state had only recently provided additional compact discs ("CDs") and information related to witnesses that would testify under plea agreements. (Tr. at 10-15.) Assistant prosecutor, Douglas Stead, who was also the prosecutor in the other murder case with Luther, opposed the continuance stating that during the last hearing, the parties had set a definite trial date for this matter knowing that the other murder trial was also scheduled. (Tr. at 16.) According to Stead, this case was not complex as Baldwin had confessed to the offenses. (Tr. at 16.) Stead explained that the CDs were of a woman that Baldwin spoke with in jail, and the state would provide her background if it had not already done so. The second witness was scheduled to plead guilty the following day and the details of the plea agreement were already disclosed to counsel. (Tr. at 16.) The trial court denied the motion to continue the trial. (Tr. at 19.) The prosecutor stated on the record that the plea offer would expire at "twelve o'clock today." (Tr. at 19.)

{¶ 6} That afternoon, the parties reconvened for a change of plea hearing. At the hearing, Baldwin pleaded guilty to Counts One and Four, without firearm specifications, with a joint recommendation from the parties for a total sentence of 30 years to life in prison. (June 9, 2010 Afternoon Session Tr. at 2-3.) At the conclusion of the Crim.R. 11 plea colloquy, assistant prosecutor Emily Poe summarized the facts of the two counts.

{¶ 7} On April 16, 2009, Baldwin robbed B.H. of $6 at gunpoint. (Tr. at 10.) Baldwin was later arrested and confessed to law enforcement. (Tr. at 10.) The aggravated murder occurred on November 10, 2009. (Tr. at 10.) Baldwin had planned a robbery of J.D. who she knew "carried large sums of cash on him." (Tr. at 10.) When the robbery "went wrong," Baldwin shot J.D. in the head causing his death. (Tr. at 10.) Baldwin then proceeded to drive around with J.D.'s body in the vehicle. Baldwin drove to her mother's residence and confessed that she had shot J.D. (Tr. at 10.) Baldwin left the vehicle at an

apartment complex and called 911. (Tr. at 10-11.) Baldwin told the dispatcher that her "husband" was killed by a drug dealer. (Tr. at 11.) Despite Baldwin providing law enforcement with a false description of the vehicle and its location, the police located J.D.'s body inside the abandoned vehicle. (Tr. at 11.) Baldwin was later arrested and confessed to the crime. (Tr. at 11.) The trial court accepted Baldwin's pleas of guilty and proceeded to sentencing. (Tr. at 11-12.)

{¶ 8} During the hearing, Luther explained that Baldwin and J.D. had previously engaged in a friendly relationship. Over time, the relationship became violent, which resulted in "physical abuse on [Baldwin], sexual abuse, while [J.D. provided] drugs to her." (Tr. at 13-14.) Luther stated that he had "reviewed this case backwards and forwards, talked with the prosecutor, reviewed all the discovery to the best of my ability, looked at all the CDs, listened to those. I have had an investigator go out and try to find favorable evidence, of which I have found none." (Tr. at 14.) According to Luther, had this matter gone to trial, "the end result would have been much worse, and that is why I recommended the plea to Ms. Baldwin." (Tr. at 14.) Prior to sentencing, Baldwin made the following statement: "I just want to say I'm very sorry for what happened. There's nothing that I can say that's going to bring him back. You know, I am young, and there's nothing that I can say that's going to fix what I done, and I know what I done, and I'm responsible for what I done, and I understand that." (Tr. at 15.) The trial court, consistent with the joint recommendation, imposed a sentence of 30 years to life in prison. (Tr. at 17.) Baldwin did not file a direct appeal in this case.

{¶ 9} On April 22, 2022, Baldwin filed a motion, pursuant to Crim.R. 32.1, to withdraw her guilty plea. Baldwin alleged that her trial counsel was ineffective and that her guilty plea was not made knowingly, intelligently, and voluntarily.[2] On May 6, 2022, the state filed a memorandum contra opposing the motion. A reply brief was filed on May 13, 2022. On October 25, 2022, the trial court held a hearing on the motion to withdraw at which the following evidence was adduced.

{¶ 10} Luther testified that, prior to his retirement, he practiced exclusively in criminal law for nearly 30 years. (Tr. at 12-14.) Luther was appointed to represent Baldwin

---

[2] Baldwin also alleged that the state violated *Brady v. Maryland*, 373 U.S. 83 (1963) but withdrew the claim at the October 2022 hearing. (Oct. 25, 2022 Tr. at 7.)

on January 11, 2010. (Tr. at 15.) According to Luther, prior counsel did not discuss a battered woman syndrome defense with him, but prior counsel did say Baldwin had been abused by J.D. (Tr. at 21.) Luther testified as to his work in this case and stated that he met with Baldwin 8 times and recorded a total of 108.6 hours on the case. (Tr. at 23-24.)

{¶ 11} Luther characterized the evidence against Baldwin as "overwhelming." (Tr. at 27.) During the course of his representation, Luther learned that Baldwin had conspired with Shannon Tackett to rob J.D. (Tr. at 28.) Luther noted that Baldwin did not tell him about Tackett at the beginning of the case. (Tr. at 28.) Luther testified that Baldwin had planned an aggravated robbery of J.D. and obtained a firearm for the robbery. (Tr. at 27.) "[T]he killing occurred during the commission of the aggravated robbery, which makes it an aggravated murder. It does not make it manslaughter, and I can go into that also if you want me to." (Tr. at 28.) After the shooting, Baldwin drove around with J.D. for several hours. (Tr. at 29.) Baldwin went to see family and friends who told her to take J.D. to the hospital. One of the family members stated that J.D. was "still gurgling." (Tr. at 29.) Instead of taking J.D. to the hospital, Baldwin "continued to drive around because she knew that if she took him to the hospital and he recovered, he was going to testify against her. So she didn't do anything to help him." (Tr. at 29.) Baldwin later called 911 but lied to the dispatcher about the body's location. (Tr. at 29-30.) "[E]ventually after they decided they are going to arrest her, they go back to, I think, her grandmother's house, and she is hiding in a closet. She had time to get rid of all the proceeds out of the robbery." (Tr. at 30.)

{¶ 12} Concerning trial strategy, Luther testified that the evidence was substantial "not only from family members who saw the body in the car, but the blood on her clothing * * *. And the fact that she had conspired with Shannon Tackett, who had engaged in a proffer with the prosecutor, agreed to testify against [] Baldwin." (Tr. at 30.) Luther also received evidence that Baldwin had confessed to multiple inmates at the prison as to her involvement in the aggravated robbery and murder. (Tr. at 30-31.) Luther testified that because Baldwin had no witnesses to support her theory of the case, she would have had to testify in her own defense. (Tr. at 31.) Luther described Baldwin as a "compulsive liar." (Tr. at 31.) According to Luther, he arranged for Baldwin to proffer evidence to the state "to give her an opportunity to help herself." (Tr. at 33.) During the proffer, she continued to lie, which caused the prosecutor to terminate the meeting. (Tr. at 33.) Luther testified

that Stead would not give Baldwin any breaks at trial and "would have eaten her up." (Tr. at 35.) Luther went on to testify that, in addition to lying during her 911 call, lying during her proffer, and her inconsistent statements to police, Baldwin's confessions presented a "major problem." (Tr. at 36.) Luther concluded that Baldwin would not seem "credible with a jury." (Tr. at 37.)

{¶ 13} When asked why he did not pursue a defense involving battered woman syndrome or self-defense, Luther testified that the abuse took place months before Baldwin killed J.D. and "there was no connection between the abuse and the planning and commission of an aggravated robbery." (Tr. at 38.) According to Luther, battered woman syndrome is not applicable in this case as it includes a precalculated aggravated robbery with a subsequent shooting during the robbery. (Tr. at 38, 40.) "[Y]ou cannot go out and rob somebody and then claim self-defense when that person maybe resists the robbery." (Tr. at 39.) Luther testified that the jury most likely would not have heard of J.D.'s "bad behavior toward anybody" as it was not relevant to Baldwin's planning and conspiring to commit the aggravated robbery. (Tr. at 39.) "This is not a spur-of-the-moment decision she made. This is a prior calculation and design to commit this robbery. And as a result, a shooting occurred. And then she drives around Columbus with a body, apparently still alive, and doesn't take him to the hospital." (Tr. at 39.) Luther also noted that Baldwin never mentioned that J.D. was involved in the April robbery. (Tr. at 40.)

{¶ 14} According to Luther, he asked to continue the trial date for additional time to review discovery material and to "help Ashley." (Tr. at 41.) Luther testified that he was "making a record" and while "drained" from the prior trial, he could have tried Baldwin's case. (Tr. at 41.) "I was fully prepared to go to trial." (Tr. at 41.) According to Luther, had the case been continued, he still would have advised Baldwin to take a plea deal. (Tr. at 43.) "[S]he was looking at potentially life without parole or a 30 to life, plus a ten to life, plus six-year gun specification on top of that. If I thought there was any defense that was viable in her case that was presentable to have credibility with the jury, I would have tried this case." (Tr. at 44.) Luther recounted that during the initial plea hearing, one of Baldwin's

family members yelled "[d]on't do it," and Baldwin changed her mind. (Tr. at 45.) According to Luther, a plea was "definitely" in Baldwin's best interest. (Tr. at 49.)

{¶ 15} On cross-examination, Luther acknowledged that he told the trial court that he had evidence still to review and witnesses to research. (Tr. at 50-51.) While Luther did know J.D. was a "bad actor," he did not know that law enforcement was investigating him at the time. (Tr. at 52.) According to Luther, there was no mention of a search warrant in Baldwin's discovery. (Tr. at 53.)

{¶ 16} Stead was the lead prosecutor on the Baldwin matter. (Tr. at 64.) According to Stead, when he was assigned the case, Baldwin had already given multiple inconsistent statements to police. (Tr. at 67.) Despite her prior inconsistent statements, Baldwin had ultimately confessed to both the aggravated murder and aggravated robbery offenses. (Tr. at 67.) Stead recalled that Baldwin attempted to proffer but was unsuccessful because she could not be honest. (Tr. at 67-68.) Stead did not believe Baldwin had any viable defenses. (Tr. at 68.) "I didn't see any then. I don't see any today." (Tr. at 68.) Concerning a battered woman syndrome defense, Stead stated, "I don't know how anyone with a straight face could argue that." (Tr. at 68-69.) Stead explained that Baldwin did not live with J.D. and on the night in question she was "recruiting people to rob [J.D]. I mean, none of that is consistent with a battered woman." (Tr. at 69.) Concerning self-defense, Stead stated, "[Y]ou can't claim self-defense when you stick a gun in somebody's face and try and take their property." (Tr. at 69.) Stead testified that had Baldwin lost at trial, she would have "received far more than what she got through the plea." (Tr. at 69.) According to Stead, Luther "was an excellent defense attorney" but "there was nothing to defend" in this case. (Tr. at 70-71.)

{¶ 17} Baldwin testified that she met J.D. when she was 14 years old. (Tr. at 76.) Baldwin then moved in with J.D., 42 at the time, when she was 15. (Tr. at 76.) After a few years, J.D. became physically abusive. (Tr. at 76.) Baldwin testified that the physical abuse included choking, hitting, and leaving her in the basement for days at a time. (Tr. at 77-78.) Baldwin testified that she told her first attorney all this information. (Tr. at 79.) Baldwin acknowledged that she made multiple inconsistent statements during this case. (Tr. at 80, 88.) According to Baldwin, she was suicidal and on drugs at the time. (Tr. at 80.) Baldwin recalled Luther visiting her in jail to discuss the plea offer. When Luther disclosed the offer,

Baldwin became very upset and walked out of the meeting. (Tr. at 81.) According to Baldwin, she told Luther that she did not want to take the plea. "I didn't understand why he was bringing me a plea for 30 to life, and I felt like he should have done more investigating." (Tr. at 82.) After the morning hearing concluded, Luther discussed the case with Baldwin. According to Baldwin, she wanted a trial and recalled Luther being "upset" that he did not get a continuance. (Tr. at 84.) "[Luther] said, if you don't take this plea today, you are going to get life without parole." (Tr. at 84.) Baldwin ultimately accepted the plea because she "had no other choice." (Tr. at 84.)

{¶ 18} On cross-examination, Baldwin acknowledged Luther visited her eight times in jail, despite averring in her affidavit that he only visited her three times. (Tr. at 96.) As to the offenses, Baldwin testified that she robbed B.H. with a firearm on April 16, 2009. (Tr. at 97.) According to Baldwin, J.D. was on the phone with B.H. during the robbery. (Tr. at 98.) Baldwin conceded, however, that she did not mention to law enforcement that J.D. was involved in the robbery. (Tr. at 98.) Baldwin admitted to planning to rob J.D. with Tackett. (Tr. at 95.) Baldwin stated that she shot and killed J.D. while he was a passenger in the car. (Tr. at 104.) Baldwin admitted that she lied to law enforcement concerning J.D.'s blood on her clothes and the location of his vehicle. (Tr. at 88-91.) Baldwin testified that she had moved out and had not seen J.D. for two to three months prior to the robbery. (Tr. at 91, 105.) Baldwin acknowledged that the trial court advised her of the various rights she was waiving by changing her plea to guilty. (Tr. at 99-101.) At the conclusion of the hearing, the parties filed post-hearing briefs in lieu of closing arguments.

{¶ 19} On December 15, 2023, the trial court issued its decision denying Baldwin's motion to withdraw her guilty pleas. The trial court first found that Baldwin's argument that her guilty pleas were not knowing, intelligent, and voluntary could have been raised on direct appeal and was barred under res judicata. (Dec. 15, 2023 Decision at 7.) The trial court rejected Baldwin's ineffective assistance of counsel claim concluding that Luther adequately investigated the case and made a reasonable choice not to pursue either a battered woman syndrome or duress defense. (Decision at 12-13.) The trial court also found that Luther's failure to retain an expert concerning a battered woman syndrome defense did not negatively impact his understanding of the facts and possible defenses. Regardless, the trial court alternatively found that, even if Luther's representation was

deficient, there was no reasonable probability that, but for any errors by counsel, Baldwin would have insisted on going to trial. On March 6, 2024, Baldwin filed a motion for a delayed appeal, which we granted.

## II. ASSIGNMENTS OF ERROR

{¶ 20} Appellant assigns the following as trial court error:

> I.   THE APPELLANT WAS DENIED DUE PROCESS BY THE TRIAL COURT WHICH RENDERED HER PLEA TO BE INVOLUNTARY.
>
> II.  APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHICH AGGRAVATED THE LACK OF DUE PROCESS RECEIVED FROM THE TRIAL JUDGE.
>
> III. APPELLANT WAS DENIED DUE PROCESS OF LAW AND THUS THIS COURT SHOULD ALLOW HER PLEA WITHDRAWAL AND REMAND FOR A TRIAL ON THE MERITS - GRANT HER MOTION TO WITHDRAW PLEA.
>
> IV.  APPELLANT'S PLEA WAS NOT KNOWING AND VOLUNTARY.
>
> V.   THERE WERE UNEXPLORED SIGNS THAT THE APPELLANT WAS INCOMPETANT WHICH ALSO DENIED HER DUE PROCESS. THIS WAS ADDITIONAL INEFFECTIVENESS OF COUNSEL.

(Sic passim.)

## III. LEGAL ANALYSIS

### A. Appellant's First Assignment of Error[3]

{¶ 21} For ease of discussion, we will consider Baldwin's assignments of error out of order.

{¶ 22} In Baldwin's first assignment of error, she contends that her due process rights were violated when the trial court denied her June 9, 2010 request for a month-long continuance.

{¶ 23} The doctrine of res judicata precludes a defendant from raising a claim that could have been raised and litigated in a prior proceeding. *State v. Wogenstahl*, 2024-Ohio-2714, ¶ 24, citing *State v. Blanton*, 171 Ohio St.3d 19, 2022-Ohio-3985, ¶ 2. "Under

---

[3] Baldwin's first assignment of error references whether her plea was voluntary based on the trial court's denial of her June 9, 2010 request for a month-long continuance. We find this argument distinguishable from her central argument that the trial court erred when it denied the motion. As such, we will address all arguments involving the voluntariness of Baldwin's plea in section B of this decision.

the doctrine of res judicata, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any [claim] that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment." (Internal citation omitted.) *Blanton* at ¶ 25. Res judicata bars claims asserted in a Crim.R. 32.1 post-sentence motion to withdraw a guilty plea that were raised or could have been raised in a previous proceeding such as a direct appeal. *State v. Enyart*, 10th Dist. No. 23AP-642, 2024-Ohio-4802, ¶ 11, citing *State v. Morris*, 10th Dist. No. 19AP-152, 2019-Ohio-3795, ¶ 13. Ohio courts have applied the doctrine of res judicata to claims that the trial court erred by refusing to grant a continuance when the appellant could have raised the argument on direct appeal or a prior petition for post-conviction relief. *See, e.g.*, *State v. Moody*, 2d Dist. No. 29885, 2024-Ohio-864, ¶ 17; *State v. Myers*, 12th Dist. No. CA2019-07-074, 2021-Ohio-631, ¶ 86; *State v. Burnett*, 2d Dist. No. 2018-CA-134, 2019-Ohio-2461, ¶ 21.

**{¶ 24}** To be sure, the trial court's denial of the continuance put the parties in an uncomfortable position. However, Baldwin could have raised this issue on direct appeal. Accordingly, we decline to address whether the trial court abused its discretion in denying the continuance as the argument is barred under the doctrine of res judicata.

**{¶ 25}** Baldwin's first assignment of error is overruled.

### B. Appellant's Third and Fourth Assignments of Error

**{¶ 26}** In Baldwin's third and fourth assignments of error, she contends that her plea was not knowing and voluntary based on the trial court's denial of a month-long continuance and the state's refusal to keep the plea offer open beyond 12 o'clock that day. (Appellant's Brief at 33.)[4]

**{¶ 27}** As an initial matter, we find that Baldwin has failed to argue assignments of error three and four separately in the brief as required under App.R. 16(A)(7). While App.R. 12(A)(2) provides that a reviewing court may disregard assignments of error if the appellant fails to argue them separately in their brief, *e.g.*, *Taneff v. Lipka*, 10th Dist. No. 18AP-291, 2019-Ohio-887, ¶ 30, citing App.R. 12(A)(2), in the interest of justice, we will address Baldwin's arguments as best we can discern.

---

[4] To the extent that Baldwin's third and fourth assignments of error contend trial counsel was ineffective, which affected the knowing and voluntary nature of her plea, we will address those arguments in section C of this decision.

{¶ 28} The doctrine of res judicata " 'generally bars a defendant from raising claims in a Crim.R. 32.1 post-sentencing motion to withdraw a guilty plea that he raised or could have raised on direct appeal.' " *State v. Johnson*, 10th Dist. No. 21AP-427, 2023-Ohio-3897, ¶ 12, quoting *State v. Straley*, 159 Ohio St.3d 82, 2019-Ohio-5206, ¶ 23. Here, Baldwin could have brought a direct appeal to contest the voluntariness of the pleas based on the trial court's denial of the continuance or the state's deadline to accept the plea agreement. Because Baldwin failed to file a direct appeal from her original convictions and sentence, she is precluded under the doctrine of res judicata from raising these arguments in her Crim.R. 32.1 motion.

{¶ 29} Baldwin's third and fourth assignments of error are overruled.

## C. Appellant's Second and Fifth Assignments of Error

{¶ 30} In Baldwin's second assignment of error, she claims that trial counsel was ineffective for failing to investigate and assert defenses involving battered woman syndrome and, to an extent, self-defense.[5] In her fifth assignment of error, Baldwin argues that Luther was ineffective for failing to explore signs that she was incompetent. For harmony of analysis, we will address the appellant's second and fifth assignments of error together.

### 1. Standard of Review

{¶ 31} Crim.R. 32.1 directs that a "motion to withdraw a plea of guilty or no contest may be made only before sentence is imposed; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his or her plea." Thus, a trial court may only grant a post-sentence motion to withdraw a guilty plea to correct a manifest injustice. *State v. Muscroft*, 10th Dist. No. 20AP-423, 2021-Ohio-3342, ¶ 10, citing *Morris*, 2019-Ohio-3795 at ¶ 11. " ' "[M]anifest injustice relates to some fundamental flaw in the proceedings which result[s] in a miscarriage of justice or is inconsistent with the demands of due process." ' " *Muscroft* at ¶ 10, quoting *State v. Morgan*, 10th Dist. No. 12AP-241, 2012-Ohio-5773, ¶ 10, quoting

---

[5] We note that Baldwin, as part of her motion to withdraw her guilty plea, had argued counsel was ineffective for failing to raise a duress defense. Baldwin argued that Luther should have argued that her participation in the robbery of J.D. was the result of coercion. (Apr. 22, 2022 Mot. at 15.) The trial court rejected this argument finding Baldwin did not mention J.D. when giving a statement about the robbery of B.H., and noted it was not convinced that Luther was deficient for not raising the affirmative defense. On appeal, Baldwin appears to abandon this argument as her brief does not discuss whether Luther was ineffective for failing to raise duress as an affirmative defense. Thus, we find this argument is forfeited and decline to address the argument.

*State v. Williams*, 10th Dist. No. 03AP-1214, 2004-Ohio-6123, ¶ 5. A defendant seeking a post-sentence withdrawal of a guilty plea bears the burden to demonstrate the existence of a manifest injustice. *Id.*, citing *Morgan* at ¶ 11. A trial court should only grant a post-sentence motion to withdraw a guilty plea under "extraordinary cases." (Further citation omitted.) *Straley*, 2019-Ohio-5206 at ¶ 14.

{¶ 32} One such circumstance that would create a manifest injustice warranting the grant of a motion for a post-sentence withdraw of a guilty plea is ineffective assistance of counsel. *Muscroft* at ¶ 12, citing *State v. Tovar*, 10th Dist. No. 11AP-1106, 2012-Ohio-6156, ¶ 9, citing *State v. Yahya*, 10th Dist. No. 10AP-1190, 2011-Ohio-6090, ¶ 9. A defendant seeking to withdraw his or her guilty plea based on a claim of ineffective assistance of counsel must demonstrate: (1) counsel's performance was deficient, and (2) there is a reasonable probability that, but for the counsel's errors, the defendant would not have agreed to plead guilty and would have insisted on going to trial. *State v. Lyons*, 10th Dist. No. 21AP-156, 2022-Ohio-2224, ¶ 33, citing *Columbus v. Akbar,* 10th Dist. No. 15AP-776, 2016-Ohio-2855, ¶ 10, citing *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, ¶ 89. This court has also identified several factors, if applicable, to consider when ruling on a motion to withdraw a guilty plea based on a claim of ineffective assistance of counsel:

> (1) whether the timing of the defendant's motion to withdraw plea bolsters his assertion that he would not have entered the plea had he received competent advice from counsel; (2) whether a guilty plea automatically subjects the defendant to deportation, thus making it rational for a defendant to take his chances at trial rather than subject himself to automatic deportation; and (3) the likeliness of a favorable outcome at trial had the defendant not pleaded, as it would not be rational for a defendant to forgo a plea bargain and go to trial if a defendant faces overwhelming evidence of his guilt.

*State v. O'Garro,* 10th Dist. No. 22AP-253, 2023-Ohio-634*,* ¶ 34, citing *State v. Galdamez*, 10th Dist. No. 14AP-527, 2015-Ohio-3681, ¶ 37-42.

{¶ 33} We review the trial court's ruling on a motion to withdraw a guilty plea under an abuse of discretion standard of review. *O'Garro* at ¶ 13, citing *State v. Francis*, 104 Ohio St.3d 490, 2004-Ohio-6894, ¶ 32, citing *State v. Smith*, 49 Ohio St.2d 261 (1977), paragraph two of the syllabus; *State v. Xie*, 62 Ohio St.3d 521 (1992), paragraph two of the syllabus. Abuse of discretion connotes a decision that is unreasonable, arbitrary, or

unconscionable. *State v. Small*, 10th Dist. No. 16AP-497, 2018-Ohio-757, ¶ 10, citing *State v. Montgomery*, 61 Ohio St.3d 410, 413 (1991).

### 2. Ineffective Assistance of Counsel

{¶ 34} Baldwin first claims that Luther was ineffective by failing to thoroughly investigate the case and prepare for trial.

{¶ 35} After an exhaustive review of the record, it is apparent that Luther made reasonable efforts to prepare for trial and investigate potential defenses in the case. The record reflects that once appointed to Baldwin's case, Luther filed numerous discovery-related motions as well as utilized both an investigator and forensic psychologist. In total, Luther spent 108.6 hours working on this matter with 6.4 hours in court. (Tr. at 24-25.) The time out of court included "interviews with the defendant; extensive discussions, plea negotiations with the prosecuting attorney; research and filing the motions." (Tr. at 24.) Luther provided Baldwin with "copies of the discovery, the motions. Each time we had a meeting with the Court or a proffer with the prosecutor or the forensic psychologist, I had meetings with her. Went over this clearly with her. Explained the nature of the hearings. She asked questions. She said she understood." (Tr. at 25.)

{¶ 36} Baldwin contends that Luther acknowledged he was not prepared for trial when he stated to the court that he "had no time to even consider this case." (June 9, 2010 Morning Session Tr. at 12.) However, we find that Baldwin misconstrues Luther's remarks as this statement was in reference to the week before the plea as he was in trial on another matter. Luther's request for a continuance was sought to investigate the inmate witnesses that had only recently been disclosed. Similarly, Luther's subsequent statement that he had only listened to "some" of the CDs was regarding the additional CDs the state had just provided. (Tr. at 14.) When speaking more generally about his preparation in this case, Luther indicated at the change of plea hearing that he had reviewed the matter "backwards and forwards." (June 9, 2010 Afternoon Session Tr. at 14.) At the October 2022 hearing, Luther reiterated that he was well-prepared for the case if it had gone to trial. (*See* Oct. 25, 2022 Tr. at 24-25 ("I was prepared to go forward with the case if that is what Ashley Baldwin had requested.").)

{¶ 37} Next, Baldwin contends that counsel was deficient as he failed to seek a continuance prior to June 9, 2010. (Appellant's Brief at 17.) Baldwin posited that Luther

"overbooked himself." (Appellant's Brief at 23.) This argument is also without merit. The record indicates that Luther moved for a continuance at the May 3, 2010 pretrial hearing. The trial court granted the motion and moved the trial date from June 8 to June 14, 2010. At the initial change of plea hearing, Luther "renewed" the prior motion to continue the trial date until July. (June 9, 2010 Morning Session Tr. at 10-11.) This time, the trial court denied Luther's "renewed" request for a July trial and set the matter for trial on June 15, 2010.

{¶ 38} Baldwin next argues that Luther's representation was deficient as he failed to pursue a defense involving battered woman syndrome or self-defense. Baldwin also contends that Luther failed to adequately investigate prior abuse by J.D. of Baldwin and other women.

{¶ 39} To demonstrate self-defense, a defendant must show: " '(1) [s]he was not at fault in creating the situation that led to the affray; (2) [s]he had a "bona fide belief" that [s]he was "in imminent danger of death or great bodily harm" and h[er] only way to escape was by using [deadly] force; and (3) [s]he did not violate a duty to retreat.' " *State v. Cameron*, 10th Dist. No. 23AP-635, 2024-Ohio-2427, ¶ 31, quoting *State v. Palmer*, 174 Ohio St.3d. 561, 2024-Ohio-539, ¶ 23, quoting *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 14. At the time of trial, the burden to demonstrate self-defense was on the defendant. *Messenger* at ¶ 15 ("In a criminal trial taking place prior to March 28, 2019, the effective date of 2018 Am.Sub.H.B. No. 228 ('H.B. 228'), a defendant claiming the affirmative defense of self-defense had the burden of proving the foregoing elements of the defense by a preponderance of the evidence.").

{¶ 40} The Supreme Court of Ohio has held that expert testimony on battered woman syndrome is " 'appropriate in relation to the second element of self-defense, that is, to "assist the trier of fact to determine whether the defendant acted out of an honest belief that she [was] in imminent danger of death or great bodily harm and that the use of such force was her only means of escape." ' " *State v. McCallum*, 10th Dist. No. 19AP-796, 2021-Ohio-2938, ¶ 29, quoting *State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, ¶ 37, quoting *State v. Koss*, 49 Ohio St.3d 213 (1990), paragraph three of the syllabus. *See also* R.C. 2901.06(B) ("the person may introduce expert testimony of the 'battered woman syndrome' and expert testimony that the person suffered from that syndrome as evidence to establish

the requisite belief of an imminent danger of death or great bodily harm that is necessary, as an element of the affirmative defense, to justify the person's use of the force in question"). Testimony concerning battered woman syndrome could also help explain a subjective belief that the defendant was in danger or why she would not leave an abuser.

{¶ 41} Regarding the aggravated robbery charge, Baldwin conceded that she robbed B.H. with a firearm and J.D. was not physically present for the robbery. During the motion hearing, Baldwin insisted J.D. was on the phone with B.H. but acknowledged that she never mentioned to law enforcement that J.D. was involved in the robbery. (Tr. at 98.) Luther also confirmed that Baldwin never provided him this information prior to the change of plea. (Tr. at 40.) Concerning the aggravated murder conviction, Baldwin acknowledged that she had not seen J.D. for two to three months before killing him during the robbery. (Oct. 25, 2022 Tr. at 91, 105.) As Stead aptly stated, "you can't claim self-defense when you stick a gun in somebody's face and try and take their property." (Tr. at 69.) Stead also dismissed the idea that a battered woman syndrome defense was a viable defense strategy, stating, "I don't know how anyone with a straight face could argue that." (Tr. at 68-69.) Stead explained that Baldwin did not live with J.D. and on the night in question was "recruiting people to rob [J.D.]. I mean, none of that is consistent with a battered woman." (Tr. at 69.) Luther provided similar testimony stating, "This is not a spur-of-the-moment decision she made. This is a prior calculation and design to commit this robbery." (Tr. at 39.) Here, Baldwin planned a robbery with Tackett, procured a firearm, and shot J.D. after orchestrating the confrontation. The record also reveals that Luther sought copies of the items in the warrant's inventory of J.D.'s home and issued subpoenas to several witnesses involving J.D.'s abuse of other women. (Aug. 16, 2024 Table of Contents, Ex. K.)

{¶ 42} Thus, we are not persuaded that Luther was ignorant of the fact that J.D. was a bad actor or that he was deficient in his investigation of this aspect of the case. Baldwin fails to point to any evidence that Luther ignored or failed to discover that would revive these defenses. Luther determined, based on the facts of the case, that neither a battered woman syndrome defense nor self-defense would amount to viable defense strategies. Upon our review of the facts and evidence in the record, we reach the same conclusion.

{¶ 43} Baldwin's argument that the battered woman syndrome would have provided evidence of voluntary manslaughter is also unpersuasive. (Appellant's Brief at 29; Reply

Brief at 3.) R.C. 2903.03(A) provides that to demonstrate voluntary manslaughter, the state must show Baldwin "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." R.C. 2903.03(A). Because Baldwin had not seen, let alone suffered any abuse from, J.D. for several months prior to murdering him in a premediated robbery, the prior abuse would not have supported voluntary manslaughter. (Oct. 25, 2022 Tr. at 91, 105.) We also note that establishing prior abuse would have required Baldwin to testify in this case. Given Baldwin's prior confessions and inconsistent statements to law enforcement, Luther's belief that she should not testify at trial was wholly reasonable.

{¶ 44} Baldwin contends that Luther's representation was deficient when he advised her to plead guilty. While Baldwin posits that she could have received a better plea deal, Stead, the prosecutor on the case, insisted that Baldwin would not have received a more favorable offer. (Oct. 25, 2022 Tr. at 71.) Luther conceded that he knew J.D. was not a "stellar human being" but that did not change that he could not beat the offer at trial. *Id.* Luther advised Baldwin to take the "known penalty" instead of risking a "more severe penalty." (Oct. 25, 2022 Tr. at 58.) As to the alternative, if Baldwin had gone to trial and been found guilty, she could have potentially faced a much harsher sentence. *State v. Ellison,* 10th Dist. No. 23AP-5, 2024-Ohio-1377, ¶ 19, quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("An appellate court must judge the reasonableness of the attorney's conduct on the facts of the case, viewed as of the time of the conduct, while 'indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' "). To be sure, Luther did utilize information related to J.D.'s prior abuse of Baldwin at sentencing as a reason to follow the joint recommendation. (June 9, 2010 Afternoon Session Tr. at 13-14.) Based on the foregoing considerations, Luther's investigation and recommendation for Baldwin to accept the plea offer falls within the range of reasonable professional judgment.

### 3. Competency

{¶ 45} Baldwin's fifth assignment of error argues that trial counsel was ineffective when he did not seek a competency evaluation.

{¶ 46} Preliminarily, we note that Baldwin failed to raise this argument in her Crim.R. 32.1 motion. Generally, appellate courts do not consider questions not presented to the court whose judgment is sought to be reversed. *See, e.g., Cardinal Health 108, LLC v. Columbia Asthma & Allergy Clinic, LLC*, 10th Dist. No. 21AP-460, 2022-Ohio-2018, ¶ 13. " 'A party who fails to raise an argument in the court below waives his or her right to raise it on appeal. An appellate court must, therefore, limit its review of the case to the arguments contained in the record before the trial court.' " (Citations omitted.) *Id.*, quoting *Betz v. Penske Truck Leasing Co., L.P.*, 10th Dist. No. 11AP-982, 2012-Ohio-3472, ¶ 34. Because Baldwin failed to raise this argument with the trial court, the argument is forfeited on appeal.

{¶ 47} Even if the argument was not forfeited on appeal, Baldwin's argument is without merit. Under R.C. 2945.37(G), "[a] defendant is presumed to be competent to stand trial." At the June 9, 2020 morning hearing, Luther informed the trial court that he had arranged for Baldwin to be evaluated by a forensic psychologist who prepared a report. The record indicates that the trial court permitted Dr. Dennis Eshbaugh to visit Baldwin at the jail to complete an assessment on March 23, 2010. At the plea hearing, Luther informed the trial court that Baldwin was mentally competent based on the evaluation. (June 9, 2010 Afternoon Hearing Tr. at 4). During the plea colloquy, Baldwin appropriately answered the trial court's questions, and informed the trial court that she had never been found to be mentally ill or incompetent. (Tr. at 4.) There is no meaningful evidence in the record that Baldwin was unable to consult with Luther "with a reasonable degree of rational understanding and has a rational as well as a factual understanding of the proceedings against [her]." *State v. Beeker*, 5th Dist. No. 2021 CA 00072, 2022 Ohio App. LEXIS 1325, *9 (Apr. 28, 2022), citing *State v. Roberts*, 137 Ohio St.3d 230, 2013-Ohio-4580, ¶ 82, citing *Dusky v. United States*, 362 U.S. 402 (1960). As such, we find Luther acted reasonably when he did not continue to pursue a defense involving Baldwin's competency to stand trial.

{¶ 48} Because we find that Baldwin has failed to demonstrate that trial counsel's representation was deficient, we decline to examine the second prong of *Strickland* as to whether there is a reasonable probability that, but for the counsel's errors, the defendant would not have agreed to plead guilty and would have insisted on going to trial.

Accordingly, the trial court's denial of Baldwin's motion to withdraw her guilty plea was not an abuse of discretion.  Baldwin's second and fifth assignments of error are overruled.

## IV.  CONCLUSION

{¶ 49} Having overruled Baldwin's five assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and EDELSTEIN, JJ., concur.

————————————